In the Matter of the Liquidation of NEW YORK TITLE AND MORT-
GAGE COMPANY.*

WILLIAM P. CLARK, NEW YORK TITLE AND MORTGAGE CORPO-
RATION and GOLDEN HILL BUILDING CORPORATION, Appellants
on Appeal No. 1; WILLIAM P. CLARK and GOLDEN HILL
BUILDING CORPORATION, Appellants on Appeal No. 2; LOUIS H.
PINK, as Superintendent of Insurance of the State of New York,
as Liquidator of NEW YORK TITLE AND MORTGAGE COMPANY,
and Others, Respondents.

(Consolidated Appeals.)

First Department, June 18, 1937.

*See 160 Misc. 67; 161 id. 564; Id. 568.

*William A. Barber* of counsel [*Joseph Diehl Fackenthal* with him on the brief; *Barber, Fackenthal & Giddings*, attorneys], for the appellant William P. Clark.

*Raphael H. Weissman,* for the appellant Golden Hill Building Corporation.

*Harry Rodwin* of counsel [*Jess H. Rosenberg* and *Joseph Lapidus* with him on the brief; *William A. Shea*, attorney], for the respondent Louis H. Pink, Superintendent of Insurance, as liquidator of New York Title and Mortgage Company.

*Leon Leighton* of counsel [*Sidney Harris* and *Sidney Kaminsky* with him on the brief], for the respondent Brentmore Estates, Inc.

*Ralph C. Williams, Jr.,* of counsel [*Martin A. Schenck* with him on the brief; *Davies, Auerbach & Cornell,* attorneys], for the respondent Irving Trust Company, as trustee.

*Abraham N. Geller* of counsel [*James Hendrick Terry, Bernard A. Saslow* and *Robert B. Block* with him on the brief; *Abraham N. Geller,* attorney], for the respondent Continental Bank and Trust Company, trustee for Series N-83 and N-108, and for the trustee of Series N-58, and [*Burlingame, Nourse & Pettit,* attorneys], for the trustee for Series N-59 and the trustee for N-85.

*Edwin W. Cooney* of counsel [*Edward L. Hunt, Jr.,* with him on the brief; *Mitchell, Taylor, Capron & Marsh,* attorneys], for the respondent City Bank Farmers Trust Company.

*Michael F. Dee* of counsel [*Morris Amchanitzky* and *Jesse Freidin* with him on the brief; *Maurice Finkelstein,* attorney], for the respondent Mortgage Commission of the State of New York.

*Ralph W. Crolly* of counsel [*Cullen & Dykman,* attorneys], for the respondent Brooklyn Trust Company.

*Simon H. Rifkind* and *Abraham J. Halprin* of counsel [*Sidney R. Nussenfeld* with them on the brief; *Wagner, Quillinan & Rifkind,* attorneys, for the trustees of Series F-1]; [*Sherman S. Rogers,* attorney, for the trustees of Series C-2]; [*Barnet Kaprow* with them on the brief; *Kramer & Kleinfeld,* attorneys, for the trustees of Series B-K]; [*Joseph L. Maged* with them on the brief; *Thomas Keogh,* attorney for the trustees of Series Q], and [*Olin Potter Geer* with them on the brief; *Olney & Geer,* attorneys for the trustee of Series A-2], for the respondents.

CALLAHAN, J.   The New York Title and Mortgage Company was placed in liquidation on July 15, 1935.   The Superintendent of Insurance, as liquidator, desiring to ascertain the proper basis for fixing claims of persons holding the company's contracts of guaranty, made a report allowing four typical claims.   These he presented to the Supreme Court, asking for confirmation of the allowance thereof.   Objection was made by the company and two of its stockholders, who appeal (1) from an order of confirmation allowing the claims, and (2) from an order denying a motion for an open hearing on certain issues.

The four typical cases are referred to as the " Ryder," " Martin," " Schwer " and " Berlenbach " claims.

The " Ryder " claim is made by the holder of a policy guaranteeing payment of principal and interest of a whole mortgage of $5,500.

The " Martin " claim is based on a guaranty of a one-half interest ($12,450) in a similar whole mortgage of $24,900.

The " Schwer " claim is based on a guaranteed mortgage participation certificate of the face amount of $5,000, in Series N-20, issued against a single mortgage of $350,000.

The " Berlenbach " claim is based on four guaranteed mortgage participation certificates aggregating $15,000 in Series BN, a group series issued against two mortgages on separate parcels of real estate, the mortgages aggregating $194,500.

The guaranties in all these cases are substantially the same. The " Ryder " agreement, which may be taken as typical, guarantees " First: Payment of interest on the said bond and mortgage　*　*　* when and as　*　*　* due　*　*　*; " and, " Second: Payment of the principal of the said bond and mortgage, and of every instalment thereof, as soon as collected, but in any event within eighteen months."

Under the contracts of guaranty the claimants were bound to permit the company to collect all interest and to refrain from collecting interest or principal. The claimants agreed to look only to the company for payment. The company's obligation to pay did not depend upon the mortgagor's default. The obligation of the company to claimants was plainly primary and absolute.

The company defaulted in its obligation. This default revoked the agency granted the company and entitled the claimants to take over the mortgages (*Matter of People [Title & Mortgage Guarantee Co. of Buffalo]*, 264 N. Y. 69, 86). In none of the cases, however, has the claimant reduced the underlying real estate to possession.

Subdivision 5 of section 425 of the Insurance Law, relating to claims of the kind involved herein, provides: " No claim of any secured claimant shall be allowed at a sum greater than the difference between the value of the security and the amount for which the claim is allowed, unless the claimant shall surrender his security to the Superintendent in which event the claim shall be allowed in the full amount for which it is valued."

The present claimants have not surrendered their securities to the Superintendent.

On these appeals the parties agree, *first*, that the obligation of the company is primary; *second*, that these claimants are " secured claimants " within the contemplation of subdivision 5 of section 425 of the Insurance Law; *third*, that the loss sustained must be fixed as of July 15, 1935, with the necessary corollary that the securities are to be valued as of that date; and, *fourth*, that, in fixing the claimants' losses, there must be allowance for such sums as might be realized on the mortgage bonds. The parties are in disagreement as to the following questions:

(a) Whether section 1083-b of the Civil Practice Act requires that the value of the underlying real estate be offset against the sum guaranteed?

(b) Whether the present claimants were discharged by reason of the restrictions imposed on foreclosure actions under the Mortgage Moratorium Laws?

(c) Whether the " security " held by the claimants who retained mortgages is such mortgages or the underlying real estate?

(d) Whether the proper method of valuing the security is to take the value of the real estate, less cost of foreclosure, or the value of the mortgages as such on the date of liquidation?

(e) Whether any allowance should be made to those holding participation certificates, or shares in mortgages because of the fractional nature of their interests?

These disputed questions may be divided into two groups: Questions (a) and (b), which concern the effect of the Moratorium Laws on the rights of the parties, and the remaining issues (c), (d) and (e), which concern the nature of the securities and the proper method of valuing the same.

Section 1083-b of the Civil Practice Act, which requires the set off of the value of real property mortgaged in arriving at any deficiency judgment, has been held to be available to a guarantor of a mortgage. (*Klinke* v. *Samuels*, 264 N. Y. 144, 149.) That case involved an action against a guarantor. The present proceeding does not come within the letter nor the spirit of the statute. It is not an action to foreclose a mortgage or to recover a judgment for an indebtedness secured by a mortgage, but an equitable proceeding for the distribution of the assets of an insolvent guarantor. Reflection on the history of the legislation and the purposes sought to be achieved thereby clearly indicates that the emergency statute for the relief of mortgagors has no application to this case. (See *Weisel* v. *Hagdahl Realty Co., Inc.*, 241 App. Div. 314; *City Bank Farmers Trust Co.* v. *Ardlea Incorporation*, 267 N. Y. 224.)

The contention that the moratorium statutes discharge the guarantor's obligations likewise is without merit. There is involved no voluntary act of the holder of the guaranty but a legislative fiat which suspends the enforcement of rights. While there are other reasons which may be advanced to show the appellants' contention in this regard is without force, at least as to mortgages in default as to interest or taxes and as to certificated issues, the reason stated is sufficient and answers the point made as to all mortgages involved.

The remaining questions concern the nature and proper method of valuing the security. The appellants contend that the security

held by the claimants is the underlying real estate and not the mortgages thereon. They contend that the proper method of valuing the claimants' security is to value the real estate, deducting the cost of forelosure of the mortgages.

While the real estate may accurately be described as the security as between mortgagor and mortgagee, the claimants herein bought guaranteed mortgages, not land or buildings. The defaults of the company on its contracts of guaranty have revoked the exclusive agency of the company and have given the claimants the right to control of the mortgages, but none of the present claimants hold real property. They hold mortgages or fractional interests in mortgages. Their right to reduce the real property to possession would depend, *first*, on whether there was default under the mortgages held, and, *second*, the nature of the default. The Mortgage Moratorium Laws, in effect July 15, 1935, limited the right to foreclose mortgages to default for non-payment of interest or taxes. Even such defaults could be cured by payments made before foreclosure actions had progressed to a specified stage. The mortgagees might prefer to accept a smaller rate of interest, or otherwise lessen the burdens imposed by the mortgages, in order to better their chances to secure full payment of the principal. This should not prevent them from claiming the protection of their guaranties. Therefore, not only was there no actual possession by these claimants of real property, but it was impossible on the date of liquidation to foretell when in the future such possession might occur, if it occurred at all.

In addition, claimants holding divided interests in mortgages might meet with difficulties in foreclosure, if and when such right became available. Their ownership of the mortgages being fractional, resulting control became more difficult.

It is admitted that there are many other claimants holding contracts of guaranties issued by this company, who have reduced to possession the real estate covered by their mortgages, or some of it. Undoubtedly these claimants must measure the value of their security by the value of the real property, less the sums expended to obtain possession thereof. These claimants have real estate, not mortgages, as their security. Those whose claims are now before the court are not in the same position. The ideal method of fixing the value of all claims would result in no inequalities as between those claimants holding mortgages and those holding real estate. We know of no formula for proving claims which will result in exact justice for all claimants. All that can be expected is the application of the most equitable rule to the greatest number.

The Superintendent in his report recognized several possible methods of fixing the value of the security held by the present claimants. One of such methods was that the amounts of the claims be fixed at the difference between the face amount of the guaranties and the value of the underlying real estate, less suitable allowance for foreclosure and necessary incidental expenses. He further recognized, however, that this method of fixing the value of the claims might be unfair to the large number of certificate holders (such as present claimants) who did not have possession of the real estate. He recommended in these cases the adoption of the method approved by Special Term, that is, fixing the amount of the loss of such guaranty holder at the difference between the full amount of the guaranty, plus interest, and the fair value of the mortgage as a mortgage. This we deem proper where an equitable valuation of the mortgages as such may be and is made. The Superintendent also stated in his report that, in applying this rule of valuing mortgages as such, care should be taken not to apply a technical rule of market value alone. This for the reason that, if the value of the certificates were fixed at market value alone, such value would reflect distressed market conditions existing on the date of liquidation. He recommended that the mortgages should be fairly valued on the basis of a consideration of the broader elements of equity and the realization that the mortgage market was still abnormal and did not reflect the real intrinsic value of mortgages.

The Superintendent submitted appraisals of the present mortgages, made by men of wide experience, who supported their opinions of value by proper affidavits. These were in nowise met by any counter appraisals submitted on behalf of the present appellants, nor was the credibility or capability of any appraiser attacked. Under such circumstances, it seems to us that the statements of valuation submitted by the Superintendent were sufficient to establish *prima facie* the value of the mortgages, and the court at Special Term was justified in confirming same. However, the meagre nature of the statements submitted by the appraisers rendered them of little value in laying down a rule to apply to the bulk of like claims, for the reason that they failed to show the methods followed in arriving at the valuations fixed. In two of the appraisals the percentage of sixty-six and two-thirds per centum of the value of the real estate was fixed as the fair value of the mortgage. In the other instances there were no statements from the appraisers as to how they fixed the valuations of the mortgages in comparison with the appraised value of the real estate. If we compute it on a percentage basis, we find one of the mortgage valuations fifty-five per centum of the real estate.

In addition, allowances were made up to fifteen per centum for mortgages in divided ownership. We are not told that there is a common and accepted method of valuing existing mortgages by taking a percentage of the value of the land. We know that such a formula is sometimes applied in determining the maximum amount that can be safely loaned on mortgages on real property in the city of New York. The question here is not what would be loaned on a new mortgage. Unless that figure approximates the present value of the existing mortgages, it should not have been used. We have a sworn statement that it does represent the fair value of the mortgage lien. We have nothing to show whether the appraisers, in fixing their valuations, considered such elements as the present condition of the mortgage with respect to payment of interest and taxes, or the past record with respect to such payments, the interest rate being paid, the effects of the Moratorium Law, the due date of the mortgages, the expense of reducing mortgaged property to possession in the event foreclosure is necessary, and other elements that would be material in fixing the value of existing mortgages as of a certain date. In other words, while we have definite allegations of values based on a percentage of the land values, the appraisers fail to disclose what relation there is between the sum fixed by them as the worth of the mortgages, and their appraisals of the underlying real estate. We know they have allowed a margin or " cushion " between the value of the land and the value of the mortgage but are not told why the particular margin was fixed in each case. The same criticism may be made of deductions fixed by the appraisers as a proper allowance because of divided ownership in the case of certificated issues. There is no information to show that percentages so fixed reflected the actual diminution in value because of such ownership.

In addition, the appraisals fail to show whether the appraisers considered whether the various mortgages were in the hands of trustees, the State Mortgage Commission, or some other united group, which facts might affect the degree of control afforded claimants. No allowance for divided ownership should be made unless it reflects a probable monetary loss because of such circumstances.

Therefore, while we approve of the confirmation of the amounts awarded, we do so solely because they were opinions under oath as to valuations which were sufficient *prima facie* to justify the court in fixing the value of the mortgages, and because such appraisals, although meagre as to evidence of methods used, were in nowise contradicted.

In fixing the value of mortgages as to the bulk of the claims, the appraisers should state in detail the basis of their valuation

and method of appraisal. If it is indicated that such methods would result in an allowance that would increase the award which might be made to any claimant beyond his probable loss, such method should be disapproved.

The Superintendent's recommendations as to values are ordinarily entitled to great weight. (See *Matter of National Surety Co.*, 248 App. Div. 111, 117; affd., 272 N. Y. 613.) The court should be reluctant to substitute its judgment for that of the Superintendent, unless it appears that the methods pursued or the valuations arrived at were improper. We find no such impropriety here. The fundamental question raised on this appeal is whether it was proper to value the security held by claimants by appraising the mortgages rather than the underlying real estate. We deem that it is proper to value the mortgages as such in those cases where the real estate has not been reduced to possession. We, therefore, affirm the order on Appeal No. 1.

As to Appeal No. 2, from the order denying the motion for open hearings on the question of valuation, we feel that the court at Special Term was correct in denying same on the record before it. No issue of fact was raised below. The expense that would ensue from the taking of testimony, either before the court or a referee, concerning values of the nearly 40,000 mortgages still to be appraised, should be avoided if unnecessary. The submission of detailed appraisals and affidavits, with the opportunity on the part of the appellants or other creditors to contradict same, should be sufficient to permit the court to determine whether the values fixed by the Superintendent were justified and equitable. If contradictory affidavits are submitted raising issues of fact in these cases, the Special Term may direct the examination of witnesses, either before the court or a referee, for the determination of those issues.

The orders appealed from should be affirmed, with costs.

UNTERMYER and COHN, JJ., concur; MARTIN, P. J., and TOWNLEY, J., dissent and vote to reverse.

TOWNLEY, J. (dissenting). These appeals involve a determination for the guidance of the Superintendent of Insurance (hereinafter called the Superintendent) of what method shall be adopted in valuing the security underlying certain guaranties made by the New York Title and Mortgage Company (hereinafter called the mortgage company). The guaranties were given as a part of its business of selling guaranteed mortgages or participations in such mortgages. The mortgage company was placed in liquidation under an order of July 15, 1935. It had been in rehabilitation since August 4, 1933. As of December 31, 1933, the principal amount

of mortgages securing its guaranties was $379,000,000. There were $195,000,000 of guaranteed whole mortgages, $83,000,000 in guaranties of certificates issued against a single mortgage; and $100,000,000 in guaranties of certificates issued against more than one mortgage known as a group series.

Four concrete cases illustrating the Superintendent's intended procedure in relation to supposed type claims arising under different kinds of certificates sold by the mortgage company are presented for review. The statutory authority under which the Superintendent must act is found in subdivision 5 of section 425 of the Insurance Law, which provides: " No claim of any secured claimant shall be allowed at a sum greater than the difference between the value of the security and the amount for which the claim is allowed, unless the claimant shall surrender his security to the Superintendent in which event the claim shall be allowed in the full amount for which it is valued."

The Superintendent has reported that claims arising under these mortgage guaranties are secured claims and arose out of the breach of a primary obligation of the mortgage company. All parties to this appeal are satisfied with the decision of Special Term confirming the report to the extent that the mortgage company is primarily liable. There is no appeal on that point and, so far as the liquidation of this mortgage company is concerned, that interpretation of the guaranties must be treated as the law of the case.

The dispute herein concerns, *first*, the definition to be given to the word " security " in subdivision 5 of section 425 (*supra*), and, *second*, after the word is defined, to determine the resulting standard of value to be applied to fix the amount of the claimant's loss. The appellants claim that in effect the security is the land which has been pledged to secure the payment of the bond and that a mortgage is nothing more than a conveyance of that land as security. Special Term and the Superintendent have taken the position that the " security " referred to in the statute is the mortgage more or less divorced from its underlying security, which must be valued as a chose in action and which was theoretically salable in a free " mortgage market " on the date of the liquidation order.

In *Matter of Bond & Mortgage Guarantee Co.* (271 N. Y. 452) the Court of Appeals had occasion to touch on this topic though it did not decide it. That case concerned claims similar to those herein which had been filed against a mortgage company not in liquidation but in process of rehabilitation. Certain remarks, however, are helpful as showing the approach which the Court of Appeals took to the question of damages for a breach of guaranty. Chief Judge CRANE wrote as follows (p. 459): " It may be that

the mortgagee will never suffer any damage or make any claim for breach of contract. The mortgage has not been foreclosed nor the property sold. The mortgagee still holds the security and at present can make no claim against the guarantee company, as there has been no determination that the mortgage is not good for the amount of the bond. Until there has been a foreclosure and sale of this property and a determination of the deficiency there can be no claim made upon the guarantor as a going concern for damages. (Insurance Law [Cons. Laws, ch. 28], § 402.) Remember, this would not be so if the guarantor were in liquidation. Sections 424 and 425 of the Insurance Law apply to liquidation proceedings. Section 424 provides for the presentation of claims against the insolvent. Section 425 relates to the proof of claim, subdivision 5 of which reads as follows: [Quoting the section above quoted.] * * *. It [the Guarantee Company] was not liable to the mortgagee until there had been a foreclosure and sale of the property, and the loss, if any, determined. Surely the mortgagee now has the right to foreclose its mortgage or to extend it indefinitely. Suppose it forecloses today and is paid the full amount due. What possible claim can it have against the guarantor or the Superintendent of Insurance? "

We must conclude from this that the holders of promises made by a guarantor of payment of principal and interest have no claims against such guarantor for damages for their breach while the guarantor is still in business. Until there has been a foreclosure, even though a considerable period of time has elapsed in which the contract has not been kept, there is no damage. It is to be noted also that when referring to losses the court constantly speaks of the determination of the loss as being based on a deficiency between the amount of the bond and the amount realized on a foreclosure of property. Hitherto the Superintendent urged that even in liquidation the loss arising from the guarantor's breach of contract for the payment of principal and interest must be offset by the value of the property pledged. (See *Matter of Bond & Mortgage Guarantee Co.*, 247 App. Div. 911; modfd. on other grounds, 271 N. Y. 452.) The change in the Superintendent's recommendation as found in the present case is not based on any particular formula to determine the value of a mortgage as a chose in action. Indeed, counsel for the Superintendent is very particular to state that there is no formula and that he is merely attempting to find the value of the mortgage in each case. The reasons that have been given to justify the Superintendent's report (which will be adverted to later) are largely furnished by counsel for the various respondents in the case. Abstract discussion, however, of the value of a mortgage as a chose in action leads to no conclusion. It is necessary

to see exactly what the recommendation of the Superintendent is in each of the cases presented in order to review the finding as to what should be allowed as the loss in each instance.

The first claim is the Ryder claim which was reported by the Superintendent as follows:

" Face amount of claim:

| | | |
|---|---|---|
| Principal | $5,500 | 00 |
| Accrued interest | 113 | 44 |
| Total | $5,613 | 44 |

" Value of real estate:

Two-story store and apartment building, good condition, fully occupied by one tenant at annual rent of $1,200:

| | | |
|---|---|---|
| 1935 assessed value | $10,000 | 00 |
| Value estimated by appraiser | 8,500 | 00 |
| Value of mortgage as fixed by appraiser: | | |
| 55.3% of appraised value of real estate | 4,700 | 00 |

" Computation of amount allowable:

| | | |
|---|---|---|
| Face amount of claim | $5,613 | 44 |
| Less appraised value of mortgage | 4,700 | 00 |
| | $913 | 44 " |

Assuming the correctness of the real estate appraisal, it is quite obvious that the mortgage claim is amply secured in any foreclosure action that Mr. Ryder may bring. The reasonable probability is that his claim will be paid in full. In spite of this, however, the Superintendent has reported that Ryder has suffered an anticipated loss of $913.44. In the absence of any detailed reasons by the Superintendent for this extraordinary conclusion, we have turned to the reasons given by respondents in justification of his recommendation. The reasoning seems to be that the Superintendent determined that he was bound to value the mortgage or an interest in the mortgage and not to value real estate. In effect they say that a person who holds collateral security for a debt does not own the security but only has a right to realize on it on default. The date of default was July 15, 1935. It is then argued that the claimant on that date was possessed of an interest in certain collateral and that when the loss is to be fixed as of that date, the price the security would command on that day is the value that the appraisers were required to find. In support of this method of fixing the value of the security, it is argued that no fiduciary

or institution would make a loan where the value of the real estate was not fifty per cent greater than the amount of a mortgage, and no fiduciary or institution would on that day have purchased any of these mortgages at a price that was more than sixty-six and two-thirds per cent of the appraised value of the real estate. It is said that even in prosperous times, when mortgage loans were readily obtainable, a person could not realize on a mortgage more than sixty-six and two-thirds per cent of the fee value even assuming the equity was sound. Applying this idea to the condition which existed on July 15, 1935, it is said that it is necessary to set the value of the mortgage at a substantial discount from the appraised value of the underlying security so that there will be a sort of " cushion " between the probable realizable value and the amount at which the mortgage could theoretically be sold in a free mortgage market.

All arguments in this case come back to the propriety of allowing this discount from the appraised value of the underlying security. If this sort of deduction is justifiable, then we have a result which awards substantial damages for a broken promise of guaranty under conditions which will result in an unjust enrichment of the mortgage or certificate holder. There must be something wrong with a system of valuation which gives Mr. Ryder a cushion of some $3,800 on a $5,500 mortgage when the real estate itself is concededly worth $8,500 and is in his hands to be foreclosed if there is a default in the payment of interest. The Legislature could not have intended that such a definition of the word " security " would be adopted as would produce such a result as this.

It is important to see exactly what sort of evidential statement was made by the appraiser in determining upon a value of the mortgage which would provide the cushion above referred to. The Superintendent's report on the Ryder claim sets out a full description of the facts which led him to determine the appraised value of the real estate at $8,500. An analysis of the affidavit, however, in relation to the value put upon the mortgage, reveals that there is no evidence whatever. The most that the appraiser says, after having determined that the value of the real property is $8,500, is:

" Value of Mortgage. This property is subject to a first mortgage in the amount of $5,500., and I am of the opinion that the fair and reasonable value of this mortgage as of July 15, 1935, was the sum of Forty-seven hundred dollars ($4,700)."

In other words, having valued the real property at $8,500, the appraiser states that in his opinion the reasonable value of the mortgage is only $4,700. The point is made by the appellants, and we think it is well taken, that we need no appraisers to tell

us the legal conclusion to be reached in any matter affecting value. What we need are facts from which we can ourselves reach a legal conclusion. Judge CARDOZO said in *Moran* v. *Standard Oil Co.* (211 N. Y. 187), where plaintiff was permitted to state his conclusion: " He should have proved the premises, and let the jury draw the conclusion. He proved the conclusion and withheld the premises. In effect, he stated his opinion as to the loss of profits resulting from diverted trade. That was the very question which the jury was to pass upon."

There are many other cases in this State to the same effect. It is manifest that the sort of statement that the appraiser made is not evidential at all as to the value of a mortgage, but amounts to his unsupported opinion that the mortgage was worth $800 less than could obviously have been realized on a foreclosure. We may say in passing that the same lack of evidence is shown in the appraiser's statement of the value of all the other mortgages presented to us on this appeal. We have nothing to review except an unsupported opinion of an appraiser, and under the cases we would be forced to reject the recommendations of the Superintendent if on no other ground than that the amounts allowed are not supported by any facts.

The inability to furnish necessary facts results not from an unwillingness to do so but from the nature of the situation. There never was a mortgage market as such in this community, and if the direction of the Legislature in the statute above quoted is to be interpreted as forcing a liquidator to invent such a market, then we would have a statutory scheme of determining claims which was completely divorced from the business practice of the community. Again, such could not have been the legislative intention.

The question arises whether there is not in prior judicial expressions and decisions in this State some guiding principle which will throw definite light on the question. We think this is to be found in those cases which have adjudicated claims arising from the liquidation of security under conditions that involved realizing the value of mortgages. Chancellor KENT defined a mortgage as " the conveyance of an estate, by way of pledge for the security of debt and to become void on payment of it." (4 Kent's Commentaries, 135.) In the case of the pledge of personal property such as a chattel for the security of a debt, the chattel itself is the creditor's security and not a chose in action represented by a pawn ticket. Under those conditions, when the pledgee enforces the debt, what is sold is not the pledge as a pledge, but the chattel itself. It seems perfectly clear that the security which the mortgagee holds against the obligation of the mortgagor must be the same as the security which the mortgagee holds against

the obligation of the guarantor. Between the mortgagor and the mortgagee there never has been any question but that the security is the real estate and not a piece of paper called a mortgage, and certainly under the Moratorium Laws, such as section 1083-b of the Civil Practice Act, there has been judicial decision to the effect that there can be no proceedings against a guarantor which do not allow credit against the debt of the fair value of the real estate. (*Klinke* v. *Samuels*, 264 N. Y. 144.)

The authorities in this State universally hold that the value of a mortgage held as security is not what might be realized at a sale of the mortgage at a sacrifice, but is what would be realized upon an enforcement of the mortgage in the usual manner. (*Wheeler* v. *Newbould*, 16 N. Y. 392; *Brightson* v. *Claflin*, 225 id. 469; *Stern & Co., Inc.*, v. *Pizitz*, 240 App. Div. 509.) In *Wheeler* v. *Newbould* (*supra*) the court said (p. 397): " But where choses in action, for the payment of money, notes, bills, bonds and mortgages, are the subject of the pledge, the case is widely different. This species of property has no intrinsic value, of which one person may judge as well as another. They are the written evidences of debts due, or to become due, from others, and their value depends exclusively upon the solvency and ability of the debtor to pay them at maturity. They are not merchandise, in the usual sense of the word, and although they are sometimes the subject of sale, the practice is of recent origin, and evidence of the abuses rather than the legitimate uses of credit. A creditor holding such property in trust, for the use of his debtor, and offering it for sale in satisfaction of his debt, can hardly fail to sacrifice it; for unless the solvency and circumstances of the makers of the note are well known, and placed beyond doubt, few will purchase, and those only for the purpose of speculation, and at ruinously low prices. Unless the stipulations of the contract are expressly to that effect, the law will not require the debtor to submit his property to an ordeal which must be, in a great measure, destructive of its value. It will rather presume that it was the intention of the parties to the contract that the creditor should, if he resorted to the pledge in place of the personal liability of the debtor, accept the money upon the hypothecated securities, as it became due and payable, and apply it to the satisfaction of his debt. This is the fair import of the contract; for it is not reasonable to infer an intention to subject to the hazards of a sale a species of property which is not usually the subject of a sale, more especially when that property furnishes, itself, a means of reimbursing the creditor, without loss, or the hazard of loss, to the debtor. The acceptance of the pledge does not suspend the creditor's remedy against the debtor a moment after the debt falls due. But if he resorts to the hypothecated securities,

consisting of the written obligations of others for the payment of money, he must accept the money upon them as they become due, in place of selling and perhaps sacrificing them at a sale. This is just and right, both to debtor and creditor, and the law seeks to accomplish nothing less."

Not to labor the point further, we hold that the word "security" in the section is equivalent to the fair value of the property pledged, and, if any foreclosure is necessary to realize on it, there may be an allowance made for that.

The second claim presented was the Martin claim, which was determined as follows:

"Face amount of claim:

| | | |
|---|---:|---:|
| Principal (one-half of $24,900) | $12,450 | 00 |
| Interest thereon | 723 | 38 |
| Total | $13,173 | 38 |

"Value of entire real estate:

Property 100% rented with annual income of $5,322:

| | | |
|---|---:|---:|
| 1935 assessed value (city tax records) | $33,000 | 00 |
| Value estimated by appraiser | 22,000 | 00 |
| One-half of estimated value of real estate (less one-half of arrears in taxes — $880) | 10,120 | 00 |

"Value of $24,900 mortgage as fixed by appraiser:

| | | |
|---|---:|---:|
| 66⅔% of appraised value of real estate | $14,666 | 00 |
| Less arrears in taxes | 1,760 | 00 |
| Total | $12,906 | 00 |

"Value of claimant's one-half interest in mortgage as so appraised:

| | | |
|---|---:|---:|
| One-half of appraised value of mortgage | $6,453 | 00 |
| One-half of balance in assignment of rents account | 173 | 35 |
| Total | $6,626 | 35 |

"Computation of amount allowable:

| | | |
|---|---:|---:|
| Face amount of one-half interest in mortgage | $13,173 | 38 |
| Less appraised value of one-half interest in mortgage | 6,626 | 35 |
| Amount allowed | $6,547 | 03" |

Assuming that the true appraised value was properly taken at so low a figure as sixty-six and two-thirds per cent of the assessed value, nevertheless, a half interest in the property is worth $10,120. The Superintendent has computed the value of a half interest in the mortgage as only $6,453. If the appraisal of the real estate is correct, there should have been deducted from the face amount of the claim one-half the value of the real estate less one-half of the amount of the arrears of taxes plus $173.35 (see *supra*), and the claim should have been allowed at the balance of $2,880.03. In this particular case the appraised value is so much below the assessed value that the appraiser's figures are suspect. However, in the absence of any cross-examination or of any other evidence submitted by appellants, the claim should be allowed in the amount of $2,880.03.

The third claim, that of Michael Schwer, the owner of a participation certificate in a single mortgage, has been computed by the Superintendent as follows:

" Face amount of claim:

| | | |
|---|---|---|
| Principal (one-seventieth of $350,000)............. | $5,000 | 00 |
| Interest thereon.............................. | 348 | 96 |
| Total................................. | $5,348 | 96 |

" Value of real estate:

| | | |
|---|---|---|
| 1935 assessed value (city tax records)............. | $500,000 | 00 |
| Value estimated by appraiser..................... | 430,000 | 00 |
| One-seventieth of estimated value of real estate.... | 6,142 | 85 |

" Value of $350,000 mortgage as fixed by appraiser:

| | | |
|---|---|---|
| Approximately 66⅔% of appraised value of real estate.................................. | $286,000 | 00 |

" Value of claimant's interest in $350,000 mortgage as so appraised:

| | | |
|---|---|---|
| One-seventieth of appraised value of mortgage..... | $4,086 | 00 |
| Less 15% deduction because of fractional interest.. | 613 | 00 |
| Net appraised value........................ | $3,473 | 00 |

" Computation of amount allowable:

| | | |
|---|---|---|
| Face amount of claim.......................... | $5,348 | 96 |
| Less appraised value of claimant's interest in mortgage................................ | 3,473 | 00 |
| Amount allowed.......................... | $1,875 | 96" |

The amount allowed is subject to the same criticisms as were made on the Martin and Ryder cases. The claimant's interest in the real property was worth $6,142.85. The face amount of the claim is $5,348.96. The loss resulting from the mortgage company's breach of contract has, nevertheless, been fixed at $1,875.96, or nearly thirty-three and one-third per cent of the face amount of the claim, although on the Superintendent's presumably conservative estimate of the realty value there will be no loss.

There is a further question that requires discussion in the computing of the loss in this case because the Superintendent has given an allowance of a fifteen per cent deduction on account of ownership by the claimant of a fractional interest in the mortgage. As a result of this allowance, all respondents are contending that the mere ownership of a participation certificate in a mortgage puts the owner in a position in relation to that mortgage which is highly inferior to that of a claimant who is the owner of a whole mortgage, and that inferiority is being admeasured as worth the fifteen per cent deduction. This can only mean that, as a general principle, any investor who has paid $1,000 for an interest at par in a participation certificate forthwith took a loss of $150. Hitherto that has not been generally supposed to be the case. If it had been so understood trustees would never have paid par for such certificates nor would a mortgage company ever have been able to sell one except at a fifteen per cent discount. Whatever may be the increased expenses of foreclosing mortgages in which there are various holders of participations, the expense is certainly not fifteen per cent, and if it were substantially more expensive to foreclose participation mortgages than others that would not justify the deduction. The investor knowingly purchased a participation with all its disabilities as well as with all its privileges if it had any.

But we are not left in this instance to mere theory as to the propriety of a fifteen per cent allowance. The Court of Appeals in *Perillo* v. *Zunino* (259 N. Y.. 21) considered a case in which the plaintiff was the holder of a certificate in a bond and mortgage similar to those involved in the Schwer claim. The owner of the certificate was suing on it and the court in its opinion said: " The Appellate Division granted judgment on the pleadings for the face value of the plaintiff's certificate, $2,770 and interest. The plaintiff is not entitled to this amount unless the certificate which he held was worth its face value. It might have been worth nothing; the defendant's default or breach of the contract would not increase its value and all that the plaintiff would be entitled to as his damage would be his actual loss. The defendant alleges that the Pollodoro Restaurant Co., Inc., was on the verge of bankruptcy and

could not pay its creditors. The third mortgage to secure $23,000 would be worth the value of the equity over and above the first and second mortgages, amounting to $110,000. *The plaintiff's certificate, at the face value of $2,770, would, of course, be worth the aliquot part of the value of this third mortgage.* To ascertain this value calls for examination and proof." (Italics ours.)

The holder of a participation certificate is entitled to his proper fractional value without any deduction in his favor because he holds a fractional interest. The difficulties of the participation holder are purely imaginary. In the case of most of these group participation mortgages the security is already in the hands of trustees who are the legal owners of the claims or of the property, if they have taken it over to administer it on behalf of the certificate holders, their *cestuis*. The fifteen per cent deduction is not justifiable on arithmetical grounds, and is equivalent to penalizing the guarantor under circumstances where the guarantor made no promise whatsoever to pay a participation holder more damage because of his fractional holding than would be due to a holder of a whole mortgage to whom the guarantor was similarly indebted. Fractional interest is not an element of loss. In conclusion, the Schwer claim should be disallowed.

The fourth type case, the Berlenbach claim, represents a claim by the owners of participation certificates in a group of mortgages. The Superintendent computed their claim as follows:

" Face amount of claim:

| | |
|---|---|
| Principal (30/389 of $194,500) | $15,000 00 |
| Interest thereon | 331 27 |
| Total | $15,331 27 |

" Value of real estate:

| | |
|---|---|
| 1935 assessed value of property under $59,500 mortgage | $65,000 00 |
| 1935 assessed value of property under $135,000 mortgage | 140,000 00 |
| Total | $205,000 00 |

| | |
|---|---|
| Value estimated by appraiser on property under $59,500 mortgage | $66,000 00 |
| Value estimated by appraiser on property under $135,000 mortgage | 160,000 00 |
| Total estimated value | $226,000 00 |

| | |
|---|---|
| 30/389 of estimated value of such properties | $17,400 00 |

" Value of mortgages as fixed by appraiser:

| | | |
|---|---:|---:|
| $59,500 mortgage (65% of appraised value of real estate) | $43,000 | 00 |
| $135,000 mortgage (57.8% of appraised value of real estate) | 92,500 | 00 |
| Total | $135,500 | 00 |

" Value of claimants' interest in mortgages as so appraised:

| | | |
|---|---:|---:|
| 30/389 of appraised value of mortgages | $10,450 | 41 |
| Less 15% deduction for fractional interest | 1,567 | 56 |
| Net appraised value | $8,882 | 85 |

" Computation of amount allowable:

| | | |
|---|---:|---:|
| Face amount of claim | $15,331 | 27 |
| Less appraised value of claimants' interest in mortgages | 8,882 | 85 |
| Amount allowed | $6,448 | 42" |

The claimants own 30/389ths of $226,000 or $17,400. By the system of valuing one of the mortgages at 65 per cent and the other at 57.8 per cent of its appraised value, 40 per cent of the face amount of the claim was allowed. There is a cushion here of some $8,500. The claim is fully secured and except for the interposition of the Moratorium Laws the security would doubtless have realized its full value. The damages resulting from the failure to observe the guaranty have been merely nominal. With the passage of time and the improvement in the real estate market, the likelihood that there will be no damage is stronger and stronger.

The Berlenbach claim differs from the previous claims in only one substantial respect. Special Term has held that in this type of claim on certificates in a group series the mortgage company is the primary debtor and not the guarantor, and that the mortgages constitute collateral for the mortgage company's primary obligation. The decision of this question is unimportant in so far as valuing the liability of the mortgage company is concerned. The properties and mortgages have been taken over by trustees. The resulting situation is one in which the damages for the broken promise of the original obligor can be ascertained by valuing the properties and crediting their value against the total of the claims. The agreement between the mortgage company and the certificate holders nowhere provided that the mortgage company's obligation should

be liquidated after default by the sale of the mortgages. Neither holder of the certificate nor the mortgage company ever intended any such result. The Berlenbach claim should be disallowed.

The point has been made that the court should pay no attention to the objections by stockholders of this company, that in all likelihood there will be no surplus no matter how the security is valued, that the stockholders in the company are entirely responsible for the situation that has arisen and they should not be heard to criticize the standard of values applied. Their rights will none the less be fully protected by the court. But it is desirable to state that the stockholders are not the only people involved in this appeal nor the only ones who are concerned with the standard of value applied. Various types of creditors are affected by the method of valuation adopted in the Superintendent's report. One respondent, the trustee for Series N-83, urges (and is supported therein by the appellants) that, in view of the strong probability of the company's insolvency, no creditor who has not suffered a tangible and demonstrable loss should be permitted to share in the distribution of the company's assets. This trustee states that Series N-83 at the date of the entry of the order of liquidation had suffered an actual loss of 76 per cent of the principal amount of the certificate holders' investments therein. In establishing their claims the certificate holders of this series *for whose benefit the underlying real estate was reduced to possession prior to the date of the entry of the order of liquidation* will be unable to claim any deductions in the value of their underlying security, that is, there can be no speculative allowance of only 66⅔ per cent of the value of the real estate or any 15 per cent deduction. But in spite of that, under the principle of the decision under review, these direct losses are likely to be allowed upon a basis which will result in the receipt of a dividend substantially less, proportionately to the actual loss suffered, than the dividends of those creditors who, by virtue of the fact that their security was fundamentally sounder than that held by this class of claimants, *owned mortgages and not real estate* at the time of the entry of the order of liquidation. Without passing on the merits of the claims under Series N-83, the point made shows the likelihood of serious inequalities in relation to other claims not before us arising out of any such system of valuation as that applied by the Superintendent.

The discarding of any attempt to value the mortgages as a salable chose in action on the liquidation date and the substituting therefor of the reasonable value of all the properties of whatever class on that date as a basis for fixing loss is found to result in the fairest determination of the value of the broken contract of

the mortgage company. If there are any border line cases in the liquidation which it would be manifestly unfair to treat under the general rule that we have laid down, such cases can, with the approval of Special Term, be considered on an equitable basis, provided such basis does not do substantial violence to the statute.

The companion appeal brings up for review a denial of a request to be permitted to cross-examine the makers of the affidavits as to value. There is great danger in allowing an appraiser to make an unsupported, uncriticized *ex parte* affidavit of his opinion of the value of a piece of property. If the affidavit, however, is complete and shows the reason for the opinion, there would be no purpose in an extended cross-examination. Certainly, however, all parties interested should be permitted to file their own affidavits of value or bring in witnesses to testify as to the value of these properties. The parties concerned in limiting the amount of these claims should be given the opportunity to demonstrate that the Superintendent's appraiser is incorrect in his method, inaccurate in his facts or unreliable for any other reason. Accordingly, the value of these properties should be determined by a reference.

The orders should be reversed, the reports of the Superintendent of Insurance should be rejected and the matter should be remitted to the Superintendent of Insurance as liquidator for reconsideration and ultimate disposition in accordance with the terms of this opinion.

MARTIN, P. J., concurs.

Orders affirmed, with costs.